UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**MIMI L. LEE, et al.,**                           Case No. 3:11 CV 897

            Plaintiffs,                    Magistrate Judge James R. Knepp, II

     v.                                     MEMORANDUM OPINION AND ORDER

**CITY OF NORWALK, OHIO, et al.,**

            Defendants.

### INTRODUCTION

This case arises from events during and following a traffic stop, during which Norwalk police officers arrested Plaintiff Mimi L. Lee for driving under the influence of alcohol (DUI). Suing under 42 U.S.C. § 1983, Plaintiff alleges claims of excessive force against four officers in their official and individual capacities. She also alleges a cause of action against the City of Norwalk for failure to train its officers and for maintaining an unconstitutional policy. Additionally, Plaintiff's husband asserts a claim for damages due to loss of consortium, and the Plaintiffs seek punitive damages.

Defendants filed a Motion for Summary Judgment on all counts. (Doc. 20). Plaintiffs filed an Opposition (Doc. 30), and Defendants filed a Reply (Doc. 31). The Court has jurisdiction under 28 U.S.C. § 1331. The parties have consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 33). For the reasons explained below, the Court grants Defendants' Motion for Summary Judgment.

### BACKGROUND

Traffic Stop

At approximately 11:00pm on May 7, 2009, Plaintiff exited Fisher-Titus Medical Center in

Norwalk, Ohio and began urinating in the parking lot. (Doc. 1, at ¶¶ 10–11, 18; Doc. 26-2, at 2). Defendant Montana responded to a call about the parking lot urination and spotted Plaintiff leaving the lot in her truck. (Doc. 26-2, at 2). He followed Plaintiff into a Burger King parking lot across the street and conducted a traffic stop. (Doc. 26-2, at 2). Plaintiff produced her driver's license for Defendant Montana and stated she was on a medication that prevented her from controlling her bladder. (Doc. 1, at ¶ 17; Doc. 26-2, at 2). Defendant Montana smelled a strong odor of alcohol on Plaintiff's breath and noted her eyes were very glassy and bloodshot. (Doc. 26-2, at 2). Defendant Hipp arrived and helped Defendant Montana conduct the traffic stop. (Doc. 26-2, at 2).

Plaintiff agreed to take field sobriety tests. (Doc. 26-2, at 2). Her eyes showed all six clues of alcohol impairment, she swayed back and forth during the test, and she blew a 0.185 percent on a Preliminary Breath Test – more than double Ohio's legal limit of 0.08 percent. (Doc. 26-2, at 2); *see* Ohio Revised Code § 4511.19. At that point, Defendants Montana and Hipp took Plaintiff into custody for DUI. (Doc. 1, at ¶ 23; Doc. 26-2, at 2). Plaintiff resisted and struggled, refusing to get into the police cruiser. (Doc. 26-2, at 2). While Plaintiff tried to pull away from Defendants Montana and Hipp and they pushed back and forth with her, they ultimately took her to the ground to calm her. (Doc. 26-2, at 2). She calmed and agreed to get in the car, and did get into the car after Defendants Montana and Hipp lifted her to her feet. (Doc. 26-2, at 2).

Upon inspecting Plaintiff's truck, Defendants Montana and Hipp observed two unopened cans of beer in the backseat, one empty can of beer under the front seat, and another unopened can of beer in Plaintiff's purse in the front seat. (Doc. 26-2, at 2). All the beer cans were 16-ounce cans of Bud Light. (Doc. 26-2, at 2). En route to the police station, Plaintiff stated she needed her inhaler. (Doc. 26-2, at 2). Defendant Montana told her he could not reach the inhaler or stop to administer

2

it to her, and he told her it would not take long to get to the station, where he would give her the inhaler. (Doc. 26-2, at 2). Plaintiff states she also complained the handcuffs were too tight to both Defendant Montana and Defendant Hipp. (Doc. 30-2, at 2). In her Complaint, and reinforced in her Opposition, Plaintiff's only claims regarding the traffic stop allege Defendant Montana over-tightened her handcuffs and dragged her by them, causing wrist injuries. (Doc. 1, at ¶¶ 24, 41; Doc. 30, at 9).

Police Station

A video recording from the Norwalk Police Department clearly depicts the events from Plaintiff's arrival at the police station to her departure with her husband approximately one hour and forty minutes later. (Ex. 1, Light Aff., Video on file in Clerk's Office). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Thus, here – where the video recording contradicts Plaintiff's assertions – the Court may rely on video evidence in ruling on Defendants' Motion for Summary Judgment. *Renz v. Willard Police Dep't*, 2010 U.S. Dist. LEXIS 100596, at *5–6 (N.D. Ohio).

After Plaintiff entered the police station, the officers removed her handcuffs and handed Plaintiff her inhaler, which she did not use at that time. (Video segment ending in #149, at 00:07–1:28). While the video recording does not include sound, Plaintiff appears to be agitated and yelling at the officers. (*See, e.g.,* Video, segment ending in #149, at 1:50–1:58). She gestured at and rubbed her wrists several times and showed them to one of the officers. (Video, segment ending in #149, at 1:46, 2:42, 3:08, 5:23, 7:15). Plaintiff also stood up out of her chair several times, at one

3

point reaching out to grab something from one of the officers, and at one point slamming her right hand down on a table as she stood. (Video, segment ending in #149, at 2:47, 3:30, 4:58). Throughout the entire time, Plaintiff appears highly agitated and can be seen gesturing angrily. (Video, segment ending in  #149, at 4:07–5:00). When Plaintiff stood and slammed her hand on the table, an officer appears to have told her to sit back down, gesturing at the chair. (Video, segment ending in #149, at 5:02–5:26).

After remaining seated for several minutes, Plaintiff stood again, gestured at her wrist, and continued to appear agitated even after sitting. (Video, segment ending in #678, at 2:27–2:53). She leaned across the table toward Defendant Montana, continued to gesture angrily, and threw a paper on the ground. (Video, segment ending in #678, at 2:58–3:37). Throughout this time, the officers in the room appear calm. Defendant Light leaned against the lockers across the room, Defendant Montana was seated across from Plaintiff, and Defendant Hipp stood talking to Defendant Light.

Eventually, Plaintiff stood and walked toward the doorway, attempting to move past Defendant Hipp, who had blocked the door. (Video, segment ending in #678, at 3:38–3:40). She backed toward the wall after he lightly touched her shoulder and then attempted to move past him on the other side. (Video, segment ending in #678, at 3:40–3:43). At that point, Defendant Montana stood and moved toward the situation. (Video, segment ending in #678, at 3:43). Plaintiff appears to have shoved Defendant Hipp, who still blocked the door. (Video, segment ending in #678, at 3:45). Defendant Montana then grabbed the back of Plaintiff's sweatshirt. (Video, segment ending in #678, at 3:46).

After Plaintiff kicked backwards toward Defendant Montana with her right leg, he grabbed her and forcefully moved her toward the chair in which she had been seated previously. (Video,

4

segment ending in #678, at 3:46–3:49). Plaintiff hit the adjacent table, and Defendant Montana held her in a choke hold across the table while Defendant Hipp restrained Plaintiff's kicking legs. (Video, segment ending in #678, at 3:49–4:03). When Defendant Montana got Plaintiff up again, she pushed him and he took her down to the floor. (Video, segment ending in #678, at 4:04). Defendant Hipp held Plaintiff's right leg in place, Defendant Montana straddled Plaintiff to hold her still while she continued to struggle, and another officer held Plaintiff's left leg. (Video, segment ending in #678, at 4:06–4:19). The officers then turned Plaintiff onto her stomach and handcuffed her. (Video, segment ending in #678, at 4:27). After handcuffing Plaintiff, the officers helped her to her feet; she continued to strain against her handcuffs to walk toward Defendant Montana before the officers seated her in a chair. (Video, segment ending in #678, at 5:21–7:35).

While seated, Plaintiff strained at her cuffs. (Video, segment ending in #379, at 00:39, 00:44–00:48, 1:26, 1:33). When officers removed her handcuffs, she periodically continued to rub and gesture at her wrists, showing them to the officers. (Video, segment ending in #379, at 4:11, 5:15; segment ending in #843, at 0:30–00:33, 00:54; segment ending in #231, at 6:29, 9:11). Plaintiff's husband arrived (Video, segment ending in #612, at 5:03), and Defendant Cook photographed Plaintiff's arms and wrists (Video, segment ending in #286, at 6:12–8:00; *see* Doc. 27-2). Plaintiff then left the police station, accompanied by her husband. (Video, segment ending in #068, at 00:55; segment ending in #102, at 00:39).

Plaintiff's version of events differs drastically from what the video shows. While the video shows Defendant Montana took hold of the back of Plaintiff's shirt and did not move her toward the table until she kicked out at him, Plaintiff states Defendant Montana "viciously assaulted her from behind". (Doc. 1, at ¶ 28). While the video shows Plaintiff continued to struggle against the officers,

5

Plaintiff asserts she was not resisting or struggling when Defendants took her down to the floor. (Doc. 1, at ¶ 30). Because Plaintiff's version blatantly contradicts video evidence, the Court looks to the video to rule on Defendants' Motion for Summary Judgment.

<u>Medical Evidence</u>

After Plaintiff left the police station, she went to the emergency room at Fisher-Titus Medical Center complaining of right wrist pain and some soreness in her neck and left flank. (Doc. 23, at 1). She was diagnosed with contusions to her wrist and neck, and an abrasion to her neck. (Doc. 23, at 1). The hospital also x-rayed Plaintiff's wrists, but the x-ray showed "no significant bone, joint, or soft tissue abnormality." (Doc. 23-1). Plaintiff was discharged in satisfactory condition after the nurse applied an ice pack and a velcro wrist splint to her right wrist. (Doc. 23, at 3). Plaintiff continued to experience wrist pain and ultimately went to Northern Ohio Medical Specialists (NOMS) complaining of bilateral hand pain with numbness and tingling, and denying any history of numbness and tingling prior to her altercation with the police. (Doc. 23-6, at 1). The doctor diagnosed her with "bilateral traumatic carpal tunnel syndrome, right worse than left". (Doc. 23-6, at 3). NOMS eventually reported to Plaintiff that her Nerve Conduction Velocity test results were normal. (Doc. 23-7, at 1). In August 2009, Plaintiff underwent carpal tunnel surgery in both wrists, reporting she was "very happy with the progress made" after surgery despite some slight restriction with grip and function. (Doc. 23-11; Doc. 23-12; Doc. 23-14, at 1). In July 2010, Plaintiff still experienced forearm pain and occasional numbness, but no longer reported shoulder or neck pain. (Doc. 23-18, at 1).

**STANDARD OF REVIEW**

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no

6

genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## ANALYSIS

Official Capacity Claims

Plaintiffs' claims that the Defendant-officers can be held liable in their official capacities under § 1983 have no merit. Official-capacity claims are equivalent to claims against the Defendant-City. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, the Defendant-City cannot be held liable for injuries the officers allegedly inflicted because § 1983 does not permit recovery against a municipality "for an injury inflicted solely by its employees or agents." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Instead, a municipality is liable under § 1983 only where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy", inflicted the injury. *Id.* In Plaintiffs' Opposition, they reiterate their separate failure-to-train and maintenance-of-an-unconstitutional-policy claims against the Defendant-City. (Doc. 30, at 6–7, ). These claims are separate from their initial official-capacity claims against Defendants Montana, Hipp, Cook, and

7

Light and the Court considers them separately below. Because Plaintiffs' official-capacity claims against the Defendant-officers have no merit under *Monell*, the Court grants Defendants' Motion for Summary Judgment with respect to those claims.

<u>Individual Capacity Claims</u>

Plaintiffs assert individual-capacity claims against Defendants Montana, Hipp, Cook, and Light. (Doc. 1, at ¶¶ 38–49). These claims stem from events at one of two locations: the initial traffic stop, or the police station. Defendants allege they are entitled to qualified immunity on all Plaintiffs' claims against them in their individual capacities. (Doc. 21, at 9).

"Qualified immunity shields government officials from civil liability in the performance of discretionary functions so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Fettes v. Hendershot*, 375 F. App'x 528, 531 (6th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Further, qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

Plaintiffs bear the burden of showing Defendants are not entitled to qualified immunity. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). Once an officer raises qualified immunity, the plaintiff must prove (1) the officer's conduct violated a constitutional right; *and* (2) the right was "clearly established to the extent that a reasonable person in the officer's position would know the conduct complained of was unlawful." *O'Malley v. Hagler*, 652 F.3d 662, 667 (6th Cir. 2011) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Courts may exercise discretion in deciding which of these two prongs should be

addressed first in light of the circumstances at issue. *Pearson*, 555 U.S. at 236. Plaintiffs fail to carry their burden if they fail to show either that a constitutional right was violated or that the right was clearly established. *Chappell*, 585 F.3d at 907.

To prove excessive force occurred in violation of her constitutional rights under the first prong, Plaintiff must show the officers (1) actively participated in the use of excessive force; (2) supervised an officer who used excessive force; or (3) owed her a duty of protection against the use of excessive force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *see also Turner v. Toledo*, 2012 U.S. Dist. LEXIS 66908, *43–44 (N.D. Ohio). An officer may be liable for failing to protect a person from excessive force when (1) the officer observed or had reason to know excessive force would be or was being used; *and* (2) had both the opportunity and means to prevent the harm. *Turner*, 119 F.3d at 429.

Under the second prong, a right is "clearly established" if the contours of the right are sufficiently clear "that a reasonable official would understand [] what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The reasonableness of a use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1987). "Not every push or shove, even if it may later seem unnecessary . . . violates the Fourth Amendment" because courts must examine the totality of the circumstances, allowing "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving". *Id.* at 396–97. The question is whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them. *Id.* at 397.

Because – as detailed below – Plaintiffs cannot meet their burden overcoming qualified

9

immunity with regard to any of the Defendant-officers during either the traffic stop or the events at the police station, the Court grants Defendants' Motion for Summary Judgment on the individual-capacity claims against the officers.

*The Traffic Stop*

With regard to the traffic stop, Plaintiffs allege Defendant Montana "used excessive force by over tightening handcuffs and forcing the Plaintiff into the police cruiser", causing injuries to Plaintiff's wrists. (Doc. 1, at ¶ 24). Plaintiff also alleges Defendant Hipp was aware she was in pain and failed to loosen the handcuffs. (Doc. 30, at 9). She claims only wrist injuries from the traffic stop, and both parties agree this is a claim of excessive handcuffing. (*See* Doc. 21, at 10; Doc. 30, at 9–10).

While the Fourth Amendment does prohibit unduly tight or excessively forceful handcuffing, *Kostrzewa v. Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (citing *Martin v. Heideman*, 106 F.3d 1308, 1312–13 (6th Cir. 1997)), "[n]ot all allegations of tight handcuffing . . . amount to excessive force." *O'Malley v. Flint*, 652 F.3d 662, 671 (6th Cir. 2011) (internal quotations omitted). To survive summary judgment on her claim of excessive handcuffing, Plaintiff must offer sufficient evidence showing a genuine issue of material fact that (1) she complained the handcuffs were too tight; (2) the officer ignored her complaints; and (3) she experienced some physical injury resulting from the handcuffing. *Id.* (quoting *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)).

According to Plaintiff's Affidavit, she complained to both Defendant Montana and Defendant Hipp, telling them the handcuffs were too tight and asking them to loosen the handcuffs. (Doc. 30-2, at 2). Viewing the facts in the light most favorable to the Plaintiff, she has thus provided evidence establishing the first element of her excessive handcuffing claim. *See O'Malley*, 652 F.3d

10

at 671. While Plaintiff states the officers ignored her complaints (Doc. 30-2, at 2), failure to respond to her complaint during the short time it took to reach the police station does not constitute excessive force. The Burger King parking lot where Plaintiff was arrested and placed in the police car is one and a half miles from the Norwalk Police Station – less than a five minute drive.[1] The Sixth Circuit holds a reasonable officer would not know failure to respond to complaints about tight handcuffs during a ten-minute ride to a police station violates the Constitution. *Fettes*, 375 F. App'x at 533. Even if Defendants Montana and Hipp ignored Plaintiff's complaints about tight handcuffs en route to the police station, they are entitled to qualified immunity. Plaintiff's ride to the police station was even shorter than the ride at issue in *Fettes*. Further, she cannot prove any wrist injuries she sustained resulted from the allegedly too-tight handcuffs during a brief car ride and not from her own actions struggling and straining against the handcuffs placed on her later during the night. (*See* Video, segment ending in #678, at 5:37; segment ending in #379, at 00:39, 00:44–00:48, 1:06, 1:25). Therefore, the Defendants did not violate her Constitutional rights and Plaintiffs cannot satisfy their burden as to the first element of qualified immunity. Even if Plaintiffs could meet the first element negating qualified immunity, they cannot satisfy the second element.

An officer is entitled to qualified immunity when "it would not be clear to a reasonable officer that he was violating the plaintiff's rights." *O'Malley*, 652 F.3d at 671. Moreover, "a

---

1. The Court takes judicial notice of the distance between the Burger King and the police station. *See* https://maps.google.com/maps?f=d&source=s_d&saddr=283+Benedict+Ave,+Norwalk,+OH+44 857&daddr=37+North+Linwood+Avenue+Norwalk,+OH+44857&hl=en&geocode=FdINdQIdx ZkT-ykrsVwaHz06iDFlfpalczIcxg%3BFcNTdQIdWmQT-ykVTF4D-Dw6iDHesuTBovBtsA&a q=&sll=41.246377,-82.608632&sspn=0.082346,0.181103&vpsrc=6&mra=ls&ie=UTF8&ll=41. 227878,-82.603755&spn=0.00518,0.011319&t=h&z=17&layer=c&ei=ueUrUO2gBeSSxQHHlI CQBw&pw=2 (last visited August 21, 2012).

constitutional requirement obligating officers to stop and investigate each and every utterance of discomfort and make a new judgment as to whether the handcuffs are 'too tight' is neither reasonable nor clearly established." *Fettes*, 375 F. App'x at 533. Because the Sixth Circuit has concluded a reasonable officer would not realize failing to respond to complaints about too-tight handcuffs during a ten-minute ride could constitute a violation of someone's rights, and because here Plaintiff's car ride was less than half the length of the ride in *Fettes*, Defendants' actions regarding Plaintiff's handcuffs during her arrest and ride to the police station were reasonable and they are entitled to qualified immunity. *See id.*

*The Police Station*

Plaintiffs allege individual-capacity claims against Defendants Montana, Hipp, Cook, and Light for their roles in the events at the police station. As described below, each of the four Defendants is entitled to qualified immunity, and the Court grants Defendants' Motion for Summary Judgment on these claims.

<u>*Defendant Montana*</u>

At the police station, Defendant Montana spoke with Plaintiff and handed her a paper, which Plaintiff threw across the room. (Video, segment ending in #678, at 1:47–3:11). Plaintiff would not stay seated and can be seen yelling at Defendant Montana and half-standing to lean angrily across the table toward him. (Video, segment ending in #678, at 2:28, 2:50–2:57, 3:07). Defendant Montana appears to have remained calm, seated across from Plaintiff. (Video, segment ending in #678, at 3:18). When Plaintiff attempted to move past and shoved at Defendant Hipp, Defendant Montana stood and moved toward the situation. (Video, segment ending in #678, at 3:44–3:45). He reached out and took hold of Plaintiff's sweatshirt with both his hands but does not appear to have

12

touched Plaintiff's body. (Video, segment ending in #678, at 3:46). At that point, Plaintiff kicked backwards toward him with her right foot and he physically moved her toward the chair while she struggled and resisted, resulting in Defendant Montana restraining her partially on the adjacent table. (Video, segment ending in #678, at 3:46–3:52). Defendant Hipp restrained Plaintiff's leg because she kept resisting. (Video, segment ending in #678, at 3:52). With his forearm across Plaintiff's throat, Defendant Montana held Plaintiff on the table until she calmed and stopped resisting. (Video, segment ending in #678, at 3:52–4:03). As he began to help her stand, however, she pushed back at him and he took her down to the floor. (Video, segment ending in #678, at 4:04–4:07).

The other officers helped Defendant Montana restrain Plaintiff on the floor while she continued to move around resisting, requiring the other officers to restrain her legs while Defendant Montana straddled Plaintiff. (Video, segment ending in #678, at 4:07–4:36). The officers turned Plaintiff over and Defendant Montana handcuffed her. (Video, segment ending in #678, at 4:37–4:57). Defendant Montana then stood and left the room. (Video, segment ending in #678, at 4:57–5:07). He brought another chair into the room but then left again, only returning to arrange some paperwork on the table while Plaintiff continued to yell and pull against Defendant Cook to move toward Defendant Montana. (Video, segment ending in #678, at 5:29, 5:39, 5:53–6:19). Defendant Montana exchanged a few words with Plaintiff, with Plaintiff continuing to yell and lean across the table toward him. (Video, segment ending in #678, at 6:19, 6:58–7:09). Defendant Montana left before Plaintiff took the breathalyzer test (Video, segment ending in #379, at 00:11), and did not touch Plaintiff again. After she had strained at them for some time (*see* Video, segment ending in #678, 5:37; segment ending in #379, at 00:39, 00:44–00:48, 1:06, 1:25), Defendant Cook removed Plaintiff's handcuffs. (Video, segment ending in #379, at 4:25).

To overcome qualified immunity, Plaintiff would have to prove Defendant Montana's conduct violated a constitutional right and that the right was "clearly established" so that a reasonable person in Defendant Montana's position would have known his conduct was unlawful. *O'Malley*, 652 F.3d at 667. Neither the takedown to the table, the takedown to the floor, or the handcuffing on the floor could be considered excessive force, so Defendant Montana did not violate Plaintiff's constitutional rights. In their Complaint, Plaintiffs suggest Defendant Montana "viciously assaulted [Plaintiff] from behind", threw Plaintiff onto a table and choked her, and slammed her to the floor, even though Plaintiff "was not resisting or struggling". (Doc. 1, at ¶¶ 28–30). The video evidence, however, completely contradicts the tale in Plaintiffs' Complaint, and in their Opposition, Plaintiffs even concede that Plaintiff may have been noncompliant. (Doc. 30, at 13).

From the start, Plaintiff appears to have been verbally confrontational, appearing to frequently yell at Defendant Montana and the other officers. (Video, segment ending in #149, at 1:50–1:58, 4:07–5:00; segment ending in #678, at 2:27–2:57, 3:07). Plaintiff stood numerous times to confront the officers (Video, segment ending in #149, at 2:47, 3:30, 4:58; segment ending in #678, at 2:27, 2:57, 3:38), leaned across the table to yell at Defendant Montana (Video, segment ending in #678, at 2:57), threw the paper he handed her on the floor (Video, segment ending in #678, at 3:11), and tried to push her way past Defendant Hipp (Video, segment ending in #678, at 3:40, 3:43). Contrary to Plaintiffs' assertion, Defendant Montana did not viciously assault her from behind. When Plaintiff shoved out at Defendant Hipp, Defendant Montana grabbed hold of Plaintiff's sweatshirt – not her arms or body. (Video, segment ending in #678, at 3:45). When Plaintiff kicked backwards toward Defendant Montana, he took her down toward the chair, resulting in leaning her across the table, and subdued her until she calmed. (Video, segment ending in #678,

14

at 3:46–4:03). During this time, Plaintiff continued to resist with her legs, requiring Defendant Hipp to help restrain her. (Video, segment ending in #678, at 3:52). When Defendant Montana let Plaintiff stand, she immediately shoved at him, and he took her down to the floor. (Video, segment ending in #678, at 4:04–4:07).

The video shows Plaintiff continued to resist on the floor, requiring two officers to restrain her legs. (Video, segment ending in #678, at 4:10, 4:18). Though Plaintiff was handcuffed again (Video, segment ending in #678, at 4:37–4:57), she did not allege in either the Complaint or her Affidavit that she complained about the tightness of the handcuffs at the station (*see* Doc. 1; Doc. 30-2), and Plaintiff was handcuffed for less than nine minutes there (Video, segment ending in #678, at 4:26 through segment ending in #379, at 4:23). During that time, she can be seen actively straining against her handcuffs (*see* Video, segment ending in #678, at 5:37; segment ending in #379, at 00:39, 00:44–00:48, 1:06, 1:25), and the photos Defendant Cook took show only superficial redness, bruising, and scrapes (*see* Doc. 27-2). Moreover, Plaintiff cannot show her wrist problems requiring surgery resulted from too-tight handcuffs rather than from her own actions straining and struggling against the handcuffs. There is no evidence Defendant Montana or any other officer exerted excessive force or acted unreasonably with regard to the handcuffing.

Despite her assertions (*see* Doc. 30-2, at ¶¶ 16, 22), the video evidence shows Plaintiff was physically and verbally combative, and the video also shows this was much more than the "minimal non-compliance" Plaintiffs suggest occurred. (*See* Doc. 30, at 14). Plaintiffs even agree the noncompliance "may have justified some physical response" from Defendant Montana, while maintaining the force used was excessive. (Doc. 30, at 14). But the facts show Defendant Montana's use of force was justified. *See also Griffin v. Hardrick*, 604 F.3d 949, 954–55 (6th Cir. 2010)

15

(finding a reasonable basis to believe force would be necessary where the plaintiff agreed she had acted in a noncompliant manner, and where the plaintiff "had been engaged in a loud, lengthy, and animated conversation" with the jail nurse and struggled against the officers as they tried to lead her away from the nurse's station). Here, Plaintiff was verbally and physically confrontational, and continued to resist the officers even when they restrained her. Defendant Montana did not initiate any force against Plaintiff; he merely responded to her when she pushed and kicked at police officers. When Plaintiff kicked toward him, Defendant Montana had only a moment to react, and he only took her down to the floor after she continued to push and struggle once he let her up off the table. He did not use excessive force in violation of her constitutional rights.

Officers often must make split-second decisions as to the force needed in rapidly evolving, tense, and uncertain situations, and the Court must consider the circumstances viewed from the perspective of a reasonable officer on the scene, not with 20/20 hindsight. *Graham*, 490 U.S. at 396–97. A reasonable officer would not have known Defendant Montana's conduct was unlawful. Thus, Defendant Montana is entitled to qualified immunity.

### *Defendant Hipp*

At the police station, Defendant Hipp blocked Plaintiff's path when she tried to leave the holding room. (Video, segment ending in #678, at 3:39). When Plaintiff tried to move past him the first time, Defendant Hipp touched her shoulder or arm lightly, if at all, and did so again when Plaintiff tried to walk past him on the other side. (Video, segment ending in #678, at 3:40–3:43). At that point, Plaintiff appears to have shoved Defendant Hipp, but he merely pointed to the chair, apparently gesturing for her to sit back down. (Video, segment ending in #678, at 3:43–3:46). After Defendant Montana grabbed Plaintiff and moved her onto the table, Defendant Hipp touched

16

Plaintiff's left arm and then held Plaintiff's left leg as she continued to struggle against the officers. (Video, segment ending in #678, at 3:49–3:58). He then again lightly held her left arm and grabbed at her sweatshirt as Plaintiff continued to resist Defendant Montana after he pulled her to her feet. (Video, segment ending in #678, at 3:38–4:04). Once Plaintiff was on the floor, Defendant Hipp held her right leg in place as she continued to struggle against the officers. (Video, segment ending in #678, at 4:07–4:34). He then stood and observed as the other officers handcuffed Plaintiff, crouching to provide minor assistance at one point. (Video, segment ending in #678, at 4:35–4:56). He stood, and did not touch Plaintiff again. (Video, segment ending in #678, at 4:57 *et seq.*).

Throughout the entire encounter, Defendant Hipp made very little contact with Plaintiff. What contact he did have with her merely consisted of holding one leg or arm while she resisted the officers. Thus, the video evidence shows none of Defendant Hipp's conduct could be construed as excessive force. Plaintiffs also claim Defendant Hipp failed to protect Plaintiff from Defendant Montana, but this claim has no merit because their claim against Defendant Montana fails. Even if the claim against Defendant Montana had not failed, no evidence shows Defendant Hipp had any reason to know Defendant Montana would grab Plaintiff and move her to the chair or floor, and he did not have time to prevent either action. In the chair and on the floor, Defendant Hipp merely held one of Plaintiff's limbs still while she resisted Defendant Montana's reasonable use of force. Because Plaintiffs cannot show a violation of any constitutional right and certainly cannot show a reasonable officer would have known the actions taken by Defendant Hipp could possibly violate a constitutional right, Defendant Hipp is entitled to qualified immunity.

*Defendant Cook*

Defendant Cook was not in the holding room when Plaintiff attempted to walk past

17

Defendant Hipp to leave, and he did not see Defendant Montana restrain Plaintiff on the table. In fact, he did not enter the room until Defendant Montana was already in the process of taking Plaintiff down to the floor. (Video, segment ending in #678, at 4:05). Defendant Cook observed the other officers restraining Plaintiff on the floor as she resisted (Video, segment ending in #678, at 4:07–4:16) and then helped them restrain her, though he appears to have made very little physical contact with Plaintiff (Video, segment ending in #678, at 4:16–5:01). Defendant Cook helped Plaintiff to her feet and led her back to the chair (Video, segment ending in #678, at 5:14–6:24), during which time she continued to pull against him and appears to yell at the officers (Video, segment ending in #678, at 5:37–6:23). Later, Defendant Cook administered the breathalyzer test (Video, segment ending in #286, at 3:35) and photographed Plaintiff's arms and wrists (Video, segment ending in #286, at 6:10; *see* Doc. 27-2).

Nothing Defendant Cook did throughout the entire situation could be construed as excessive force. His only contact with Plaintiff on the floor was assisting the other officers restraining her as she struggled against them, and even that contact appears to have been minimal. The only other contact Defendant Cook had with Plaintiff was holding her by the arm while the other officers prepared the chair for her. Defendant Cook passively held Plaintiff, only slightly pulling her back when she tried to pull away from him. None of these actions could be construed as a violation of Plaintiff's constitutional rights. Moreover, Defendant Cook did not fail to protect Plaintiff. Defendant Montana did not use excessive force. Even if he had, Defendant Cook did not even enter the room until Defendant Montana was already taking Plaintiff down to the floor. He could not possibly have prevented actions he either did not witness or that were already in progress when he entered. Defendant Cook did not violate Plaintiff's constitutional rights and had no reason to know

18

any force used could be construed as unlawful; therefore, he is entitled to qualified immunity.

*Light*

Defendant Light did not exert any force on Plaintiff. In the police station, he offered Plaintiff her inhaler once, and then again, at which point Plaintiff used it. (Video, segment ending in #149, at 1:28; segment ending in #678, at 00:44). He may have briefly touched Plaintiff's leg while she kicked and struggled against the officers as Defendant Montana restrained her in the chair and on the table. (Video, segment ending in #678, at 3:54). Other than that, Defendant Light merely observed the incident. Eventually, he brought Plaintiff's husband into the room, provided tissues for Plaintiff to blow her nose, observed her breathalyzer test, and observed Defendant Cook photographing her arms and wrists, at one point helping him position Plaintiff's arms. (Video, segment ending in # 612, at 5:02; segment ending in #286, at 1:28, 3:28, 6:12, 7:31).

None of Defendant Light's actions could be construed as force, let alone excessive force, and he thus did not violate her constitutional rights. Defendant Light cannot be liable for failing to protect Plaintiff because Defendant Montana did not use excessive force. Further, even if he had, Defendant Light had no reason to know Defendant Montana would take Plaintiff down to the table or the floor, and did not have time to prevent these acts. Overall, Defendant Montana's actions were reasonable responses to Plaintiff's continued resistance and Defendant Light could not have known the force could have been construed as unlawful. Like the other three Defendant-officers, he is entitled to qualified immunity, and the Court grants Defendants' Motion for Summary Judgment on the individual-capacity claims.

Failure-to-Train and Maintenance-of-Unconstitutional-Policy Claims Against Defendant-City

Claims for  failure to train and maintenance of an unconstitutional policy must fail where,

19

as here, no constitutional violation occurred. *Bozung*, 439 F. App'x 513, 521 (6th Cir. 2011); *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."). Even if Plaintiff had suffered a constitutional injury in this case, however, her claims against the city still lack merit.

To succeed on her failure-to-train claim, Plaintiff must provide "affirmative evidence above and beyond the pleadings" showing (1) the Defendant-City provided inadequate training; (2) this inadequacy resulted from "deliberate indifference"; and (3) the inadequacy caused or was closely related to Plaintiff's injury. *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008). No evidence suggests the Defendant-City inadequately trained its officers or that any inadequacy caused Plaintiffs' alleged injuries. The only evidence in the record mentioning the officers' training comes from their own Affidavits, and each of the four named officers states he was "trained in the proper technique for traffic stops, arrests, restraint, take downs, and handcuffing[]" and followed those procedures in the situations involving Plaintiff. (Doc. 24-1, at ¶ 6; Doc. 25-1, at ¶ 6; Doc. 26-1, at ¶ 5; Doc. 27-1, at ¶ 3). Plaintiffs, meanwhile, offer no evidence suggesting the Defendant-City inadequately trained its officers. Though Plaintiffs state a jury may infer a city has adopted a policy of non-supervision amounting to deliberate indifference to citizens' rights when a municipality fails to adequately address claims of brutality or excessive force, Plaintiffs offer no evidence the Defendant-City in this case failed to adequately address any such claims. The Court grants Defendants' Motion for Summary Judgment on Plaintiffs' failure-to-train claim.

Plaintiffs' claim that the Defendant-City maintained an unconstitutional policy fails as well. Under § 1983, a municipality is only liable based upon the contents of a policy if a plaintiff proves

20

the municipality's deliberate conduct was the moving force behind an alleged injury. *Siler v. Webber*, 443 F. App'x 50, 53 (6th Cir. 2011). Here, Plaintiffs offer no evidence the Defendant-City's conduct was in any way related to the alleged injuries – let alone the moving force behind the alleged injuries. Where a plaintiff points to municipal policies of inaction as evidence of "deliberate conduct", the plaintiff "must show that the municipality's failure to act constitutes 'deliberate indifference' to the plaintiff's constitutional rights . . . and 'directly caused' the plaintiff's injury." *Id.* at 53–54 (internal citations omitted). Generally, the plaintiff must establish deliberate indifference through evidence a municipality ignored a pattern of similar constitutional violations. *Id.* at 54. Plaintiffs offer no such evidence in this case, and their claim the Defendant-City maintained an unconstitutional policy therefore cannot succeed. The Court grants Defendants' Motion for Summary Judgment on this count.

Loss of Consortium & Punitive Damages

Even assuming Defendants were not entitled to summary judgment on each claim, the Court finds Plaintiff's husband would not be entitled to damages for his loss-of-consortium claim and also finds Plaintiffs would not be entitled to punitive damages.

*Loss of Consortium*

Defendants correctly argue – and Plaintiffs acknowledge – that a spouse cannot state a claim for loss of consortium under § 1983 because such claims are entirely personal to the direct victim of the constitutional tort. *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000). Only the purported victim may prosecute a § 1983 claim, and there is no cause of action for collateral injuries allegedly suffered personally by the victim's family members. *Id.* However, where state law authorizes a separate state-law claim for loss of consortium, a derivative loss-of-consortium claim

21

is available in the context of a § 1983 action brought by a person whose constitutional rights were violated in such a manner as to cause her personal injury. *Kinzer v. Metro. Gov't of Nashville & Davidson Cnty.*, 451 F. Supp. 2d 931, 946–47 (M.D. Tenn. 2006). Because Ohio authorizes a spouse's separate cause of action for loss-of-consortium, the Court may exercise supplemental jurisdiction over Plaintiff's husband's pendant loss-of-consortium claim. *See id.* at 947; *Clouston v. Remlinger Oldsmobile Cadillac, Inc.*, 22 Ohio St.2d 65 (1970); *Dyshko v. Swanson*, 2009 U.S. Dist. LEXIS 46854, *35 (N.D. Ohio 2009); 28 U.S.C. § 1367(a).

Ohio law grants a husband a separate cause of action for the loss of consortium of his spouse against a person who intentionally or negligently injured his spouse. *Clouston*, 22 Ohio St.2d at 71; *Dyshko*, 2009 U.S. Dist. LEXIS 46854, at *35. To succeed, the spouse must prove (1) the defendant intentionally or negligently caused his wife's injuries; (2) he suffered a loss of consortium; and (3) his wife's injuries cause the alleged loss of consortium. *Dyshko*, 2009 U.S. Dist. LEXIS 46854, at *35 (citing *Brockmeyer v. Mansfield Gen. Hosp.*, 1987 Ohio App. LEXIS 6010, at *3 (Ohio Ct. App. 1987)).

Even assuming Plaintiff's husband could show Defendants intentionally or negligently injured his wife, he has not gone beyond the pleadings to designate specific facts showing a genuine issue for trial on the damages he allegedly suffered. *See Harvey v. Campbell Cnty.*, 453 F. App'x 557, 560 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Plaintiff's husband submitted no Affidavit regarding his claim, and has failed to provide *any* evidence pertaining to his alleged damages. By contrast, in *Dyshko*, Mr. Dyshko's deposition testimony described hobbies he and his wife could no longer enjoy together and also reported his wife spent less time with their children after the incident. 2009 U.S. Dist. LEXIS 46854, at *35–36. Because

22

Plaintiff's husband has provided no evidence he suffered any loss of consortium, he cannot establish the second element of an Ohio loss-of-consortium claim and is not entitled to loss-of-consortium damages.

*Punitive Damages*

Plaintiffs concede Defendants Hipp, Cook, and Light should not be subject to punitive damages but argue they are entitled to punitive damages against Defendant Montana. (Doc. 30, at 16). This claim also fails. First, it is moot because Plaintiffs' § 1983 action cannot survive summary judgment. *Wells v. O'Malley*, 106 F. App'x 319, 326 (6th Cir. 2004). But Plaintiffs would not be entitled to punitive damages even if the § 1983 claim survived. In a § 1983 action, punitive damages may be assessed against individual defendants when the "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 809 F. Supp. 2d 754, 793 (N.D. Ohio 2011) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

The video provides the only factual evidence regarding Defendant Montana's conduct. While Plaintiff argues she remained "totally passive", the video evidence shows otherwise. It shows Plaintiff throwing a paper across the room (Video, segment ending in #678, at 3:11), attempting to walk out of the room past Defendant Hipp (Video, segment ending in #678, at 3:40, 3:43), kicking backwards toward Defendant Montana (Video, segment ending in #678, at 3:46), shoving at Defendant Montana (Video, segment ending in #678, at 4:04), and continuing to struggle on the table (*see, e.g.,* Video, segment ending in #678, at 3:46–3:52), on the floor (Video, segment ending in # 678, at 4:10–4:18), and even once the officers helped her to her feet (Video, segment ending in #678, at 5:37–6:23). As described above, Defendant Montana responded using the action necessary

to regain control. Nothing suggests he lost his temper – in fact, he appears quite calm throughout the entire recording. Plaintiffs urge the Court to find a trier of fact could reasonably conclude Defendant Montana "lost his temper and brutalized [Plaintiff] because he was unable to control his anger", but the evidence simply does not establish he had any evil motive or intent, or acted with reckless disregard for Plaintiff's rights. Therefore, even if Plaintiffs' § 1983 claim could survive summary judgment, the Court concludes Plaintiffs would not be entitled to punitive damages.

## CONCLUSION

Because no genuine issues of material fact exist on any of Plaintiffs' claims, and because Defendants are entitled to judgment as a matter of law, the Court grants Defendants' Motion for Summary Judgment. The case is dismissed.

IT IS SO ORDERED.

_____s/James R. Knepp II_____
United States Magistrate Judge